UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CITIMORTGAGE, INC., )
 )
 )
  Plaintiff, )
 )
 v. ) Case No. 4:15-CV-230-SPM
 )
 )
EQUITY BANK, N.A., )
 )
  Defendant. )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff CitiMortgage, Inc.'s ("CMI's") Motion for

Summary Judgment (Doc. 123); Defendant Equity Bank, N.A.'s ("Equity's") Motion for Summary

Judgment (Doc. 115); and Equity's Motion to Strike Portions of Affidavit of Isaac Miller. (Doc.

187). The motions are fully briefed and ready for disposition. The parties have consented to the

jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

(Doc. 23).

### I. FACTUAL BACKGROUND

#### A. The Parties' Agreement

On January 31, 2006, CMI and Equity entered into a contract entitled "Correspondent

Agreement Form 200" (the "Agreement"). (Doc. 131-2, Agreement; Doc. 126, CMI's Statement

of Uncontroverted Material Facts, ¶ 7; Doc. 128, Equity's Statement of Uncontroverted Material

Facts, ¶ 1). The Agreement provides, in part, that "[f]rom time to time, Correspondent [Equity]

may sell to CMI and CMI may purchase from Correspondent [Equity] one or more residential

mortgage, home equity or other loans ('Loan(s)') in accordance with the terms, conditions,

requirements, procedures, representations and warranties set forth in the 'CitiMortgage, Inc. Correspondent Manual' and all amendments, bulletins, program requirements and supplements to such Manual [collectively, the 'CMI Manual'] and the Agreement." (Doc. 131-2, Agreement, § 1). The Agreement states that the CMI Manual is incorporated by reference into the Agreement. (*Id.*)

Among the representations and warranties made by Equity to CMI under the Agreement are those set forth in Section 2(k), wherein Equity represented and warranted:

> That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA, and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(*Id.*, § 2(k)). In addition, pursuant to Section 2(q) of the Agreement, Equity represented and warranted "[t]hat it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual." (*Id.*, § 2(q)). Section 2202 of the CMI Manual contained several additional representations and warranties, including, but not limited to, representations that all information relating to the loan was complete and accurate, and contained no fraud or misrepresentation; that each individual loan sold met CMI guidelines or investor requirements, with the understanding that CMI may sell each loan to a third party; that the loan complied with all agency guidelines, including Freddie Mac, Fannie Mae, VA, and FHA guidelines, in effect at the time each loan was sold to CMI; and that any appraisal submitted with each loan was completed in accordance with all state and federal laws, was submitted in support of the value of the property, and could be relied upon by CMI. (Doc. 128, ¶¶ 13-19; Doc. 135-1, CMI Manual, § 2202).

In addition, Section 11 of the Agreement provides:

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement

     (i)     was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

     (ii)     was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

     (iii)     was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-in-Lending Act) or state law or regulation;

     (iv)     must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

     (v)     was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such purchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

(Doc. 131-2, Agreement, § 11). The "Repurchase Price" mentioned in Section 11 is defined in the

CMI Manual as follows:

> **REPURCHASE PRICE**: The Repurchase Price is defined as the sum of: (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan, (iv) any price paid in excess of par by CitiMortgage on the funding date, and (v) any other fees, costs or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Doc. 136-1, CMI Manual, § 2301).

The Agreement also contains two other provisions relevant to the instant motions.

Section 1 of the Agreement states, in relevant part:

> CMI may purchase loans with or without conducting a complete review of the Loan documentation. CMI's review of, or failure to review, all or any portion of the loan documentation shall not affect CMI's rights to demand repurchase of a loan or any other CMI right or remedy provided by this Agreement.

(Doc. 131-2, Agreement, § 1).

Section 14 of the Agreement states, in relevant part:

> The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under the Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

(*Id.*, § 14).

### B.  The Twelve Loans at Issue in the Instant Action

Pursuant to the Agreement, Equity sold approximately 470 loans to CMI. (Doc. 126, ¶ 24.

Those included the twelve residential mortgage loans at issue in this lawsuit (the "Loans"): the

Degrey Loan #XXXXXX2989, the Dewey (Gatesville) Loan #XXXXXX2169, the Dewey

(Whistling Straits) Loan #XXXXXX5637, the Hansen Loan #XXXXXX6934, the Henry Loan

#XXXXXX3494, the Hunt Loan #XXXXXX0081, the Jensen Loan #XXXXXX2857, the Loucks Loan #XXXXXX8634, the Paulos Loan #XXXXXX9538, the Rivers Loan #XXXXXX0529, Russell Loan #XXXXXX3017, and the Seemungal Loan #XXXXXX1270. (*Id.*, ¶ 26). Equity underwrote and/or originated each of the Loans. (*Id.*, ¶ 30). The Loans were sold to CMI between August 24, 2007, and January 22, 2009. (*Id.*, ¶¶ 32-43). CMI subsequently sold some of the Loans to investors such as Fannie Mae and Freddie Mac. (*Id.*, ¶ 3.)

After purchasing the Loans from Equity, CMI determined that each of the Loans contained one or more defects, including but not limited to the following: the loan application package misrepresented the borrower's income; the debt-to-income ratio for the loan exceeded applicable guidelines; the appraisal contained in the loan application package failed to comply with applicable guidelines and was unsupported; the loan-to-value ratio for the loan exceeded applicable guidelines; the required documentation verifying monthly payments was missing from the loan application; CMI was required to repurchase the loan from an investor, Freddie Mac or Fannie Mae; and/or the loan application package was missing necessary income documentation. (*Id.*, ¶¶ 44, 47-86). For each loan, CMI sent a letter to Equity providing notice of the loan defects (the "Initial Repurchase Letters"). (*Id.*, ¶ 98). In addition, in cases where CMI received a letter from an investor (such as Fannie Mae or Freddie Mac) identifying a potential defect in a loan, CMI sent a letter notifying Equity of the investor's findings (the "Citing Notification Letters"). (*Id.*, ¶ 100). Equity did not cure or correct the alleged defects to the full and complete satisfaction of CMI. (*Id.*, ¶ 102). CMI subsequently sent letters to Equity with respect to each loan informing Equity that repurchase was required, stating that repurchase must be confirmed on or before thirty days from the date of the letter, and stating that if Equity failed to honor its contractual obligations by confirming repurchase of the loan on or before thirty days from the date of the letter, CMI would

aggressively pursue its options due to Equity's breach of the Agreement (the "Final Repurchase Letters"). (Doc. 126, ¶¶ 104-05; Docs. 139-5, 143-1, 148-4, 151-5, 152-5, 153-4, 156-5, 157-5, 158-5, 159-5, 160-5, 161-5). None of the Section 11-related correspondence CMI sent to Equity for any of the Loans stated the amount of the "Repurchase Price," nor did any of the correspondence contain wiring instructions for how to send funds. (*Id.*; Doc. 128, ¶ 52). To date, Equity has not repurchased any of the Loans. (Doc. 126, ¶ 107).

The Final Repurchase Letters for the Loans were sent between July 7, 2010 and November 10, 2011. (Doc. 128, ¶¶ 78, 105, 130, 151, 167, 186, 210, 229, 246, 266, 281, 296). For six of the Loans (the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans), CMI sent the Final Repurchase Letters demanding repurchase to Equity only after the Loans had been foreclosed on and the underlying property sold. (*Id.*, ¶¶ 70, 78, 98, 105, 126, 130, 181, 186, 205, 210, 242, 246; Doc. 118-32, at pp. 8-9; Doc. 118-45, at pp. 26-27; Doc. 119-8, at pp. 5-6); Doc. 119-31, at p. 13; Doc. 119-39, at p. 10; Doc. 122-9, at p. 3).

On February 3, 2015, CMI filed its Complaint in the instant action. CMI asserted breach of contract claims against Equity with respect to each of the Loans. For each loan, CMI alleged that it made a determination of certain defects, that it demanded cure and/or repurchase of the loan from Equity, and that Equity failed to cure the defects and failed to repurchase the loan. CMI seeks damages in the amount of $2,819,162.21, which it asserts represents the sum of the Repurchase Price amounts for each loan. (Doc. 123, at p. 3; Doc. 138-2).

## II.    MOTION TO STRIKE

In support of its summary judgment motion, CMI submitted the affidavit of Isaac Miller, a Repurchase Coordinator at CMI. Mr. Miller's affidavit includes his calculations of CMI's damages. Equity moves to strike the several portions of the affidavit, contending that Mr. Miller's

calculations are inconsistent with the text of the Repurchase Price formula and are based on Mr. Miller's interpretation of CMI documents that Mr. Miller lacks the necessary knowledge to interpret.

Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A motion to strike is properly directed only to material contained in pleadings." *Khamis v. Bd. of Regents, Se. Mo. State Univ.*, No. 1:09-CV-145-RWS, 2010 WL 1936228, at *1 (E.D. Mo. May 13, 2013) (quoting *Mecklenberg Farm, Inc. v. Anheuser-Busch, Inc.*, No. 4:07-CV-1719-CAS, 2008 WL 2518561, at *1 (E.D. Mo. June 19, 2008)). Rule 7(a) defines "pleadings" as a complaint, an answer to a complaint, an answer to a counterclaim, an answer to a crossclaim, a third-party complaint, and if the court orders one, a reply to an answer. Fed. R. Civ. P. 7(a). An affidavit submitted in support of summary judgment is not a pleading, and courts in this district have generally not permitted parties to attack such affidavits through motions to strike. *See, e.g., Shea v. Peoples Nat. Bank*, No. 4:11-CV-1415 CAS, 2013 WL 74374, at *1-*2 (E.D. Mo. Jan. 7, 2013) (citing cases); *Khamis*, 2010 WL 1936228, at *1 ("The affidavit attached to Khamis's memorandum in opposition is not a pleading and cannot be attacked with a motion to strike. As a result, I will deny Defendants' motion to strike."). Thus, the Court will deny Equity's motion to strike portions of Mr. Miller's affidavit.

However, Equity correctly points out that under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, in ruling on the parties' summary judgment

motions, the Court will not consider any portions of the affidavit that are not based on personal knowledge or that contain inadmissible evidence. *See, e.g., Khamis*, 2010 WL 193622, at *1.

### III.  MOTIONS FOR SUMMARY JUDGMENT

#### A.  LEGAL STANDARD

The standards applicable to summary judgment motions are well settled, and they do not change when both parties have moved for summary judgment. *See Tower Rock Stone Co. v. Quarry & Allied Workers Local No. 830*, 918 F. Supp. 2d 902, 905 (E.D. Mo. 2013) (citing *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted)).

Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. *Husinga v. Federal-Mogul Ignition Co.,* 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007). "[T]he filing of cross motions for

summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager*, 716 F.2d at 1214.

### B. DISCUSSION

CMI's claim in this case is that Equity breached the Agreement by failing to repurchase the Loans from CMI, as required by Section 11 of the Agreement. The parties agree that Missouri law governs the interpretation of the Agreement.[1] Under Missouri law, "[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010). "[P]roof of the existence of a contract and its breach make a submissible case on damages, no matter whether actual damages have been proven." *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 12 (Mo. Ct. App. 2002).

In CMI's motion for summary judgment, CMI argues that it has established each of the elements of its breach of contract claim, because it is undisputed that the Agreement provided that if CMI, in its sole and exclusive determined that one of the listed loan defects occurred, Equity was obligated to repurchase the loan after being given notice and an opportunity to cure; that CMI determined that each of the Loans contained one or more of the defects listed in Section 11; that CMI demanded repurchase after giving Equity notice and an opportunity to cure; and that Equity did not repurchase the Loans.

---

[1] The Agreement states, "This Agreement shall be governed by the laws of the State of Missouri and applicable federal law." (Doc. 131-2, Agreement, § 12).

Equity does not dispute the existence of the Agreement, does not dispute CMI's determination that the Loans contained defects that would permit CMI to demand repurchase; does not dispute that CMI demanded repurchase after giving Equity notice and an opportunity to cure; and does not dispute that it did not repurchase the Loans. However, Equity argues that CMI is not entitled to summary judgment, and/or that Equity is entitled to summary judgment instead, for several reasons: (1) Equity had no contractual obligation to repurchase the Loans, because CMI did not include certain required information in its repurchase requests; (2) Equity had no contractual obligation to repurchase the Loans, because CMI did not demand repurchase within a reasonable time after learning of the loan defects; (3) Equity had no contractual obligation to repurchase six of the Loans (the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans) (collectively, the "Liquidated Loans"), because by the time CMI demanded repurchase of those Loans, the Loans had been liquidated, no longer existed, and could not be repurchased; (4) CMI failed to establish a lack of genuine issues of material fact as to damages; (5) CMI's claims are barred by the applicable statute of limitations; and (6) CMI failed to mitigate damages as to the six Liquidated Loans. CMI opposes each of these contentions.

The Court will address each disputed issue below.

**1. Whether Equity Had a Contractual Obligation to Repurchase Loans Where the Repurchase Request Did Not Include the Repurchase Price Amount or Wiring Instructions**

Equity first argues that it is entitled to summary judgment on CMI's breach of contract claims because CMI failed to include certain information in its repurchase requests. Specifically, Equity argues that under the Agreement, a necessary prerequisite to Equity's obligation to pay the Repurchase Price was CMI's including in the repurchase request the amount of the Repurchase Price and wiring instructions. Equity contends that because CMI's repurchase requests did not

include that information, CMI failed to establish that it had satisfied a condition precedent to Equity's obligation to pay to CMI the Repurchase Price under Section 11, and Equity's obligation to pay did not arise. CMI, on the other hand, argues that the Agreement does not require it to include any specific information in its repurchase requests.

Under Missouri law, "[t]he primary rule of contract construction is to 'ascertain the intent of the parties and give effect to that intention.'" *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. 2012) (quoting *DeBaliviere Place Ass'n v. Veal*, 337 S.W.3d 670, 676 (Mo. 2011)). "If a contract is unambiguous, 'the intent of the parties is to be discerned from the contract alone' based on the plain and ordinary meaning of the language used." *Id.* "A condition precedent is a condition which must be fulfilled before the duty to perform an existing contract arises." *Lowery v. Air Support Int'l, Inc.*, 982 S.W.2d 326, 329 (Mo. Ct. App. 1998). *See also Wheelhouse Marina Real Estate, L.L.C. v. Bommarito*, 284 S.W.3d 761, 771 (Mo. Ct. App. 2009) ("The condition must occur before the duties prescribed by the contract must be performed."). "Conditions precedent are usually created by such phrases as 'on condition,' 'provided that,' 'so that,' and the like, although such expressions are not necessary if the contract is of such a nature as to show that parties intended to provide for a condition precedent." *Kansas City Live Block 125 Retail, LLC v. Bhakta*, 476 S.W.3d 326, 332 (Mo. Ct. App. 2015) (quotation marks omitted). "Missouri law clearly does not favor conditions precedent," and "[c]ourts should not construe contract provisions to be conditions precedent unless required to do so by plain, unambiguous language or by necessary implication." *James E. Brady & Co. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993).

The Court finds that the Agreement does not contain a condition precedent requiring that CMI include in its repurchase request the either the amount of the Repurchase Price or wiring instructions. Section 11 of the Agreement, which addresses repurchase requests, does not specify

any particular information that must be contained in a repurchase request. The Agreement states, simply, "If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds." (Doc. 131-2, Agreement, § 11). The Agreement contains no language conditioning Equity's obligation to pay the Repurchase Price on the inclusion of specific information in the repurchase request (such as "on condition that" or "provided that").[2] The parties easily could have included such language, but they did not. In light of the clear language of Section 11 and the Missouri law disfavoring conditions precedent, the Court finds that the Agreement does not condition Equity's obligation to pay on the inclusion of a Repurchase Price or wiring instructions in the repurchase request.

The provisions of the CMI Manual cited by Equity, which are incorporated by reference into the Agreement, do not alter the Court's conclusion. Section 2202 of the CMI Manual states, "In the event of a Breach [of representations or warranties], a Correspondent will, immediately after receipt of notification from CitiMortgage, repurchase all such relevant Loans from CitiMortgage at the Repurchase Price specified in said notification." (Doc. 135-1, CMI Manual, § 2202, at p. 83). In addition, Section 901 of the CMI Manual, which "outlines the guidelines

---

[2] This fact distinguishes this case from *Jetz Service Co. v. Botros*, 91 S.W.3d 157, 163 (Mo. Ct. App. 2002), on which Equity relies. In *Jetz*, the Court found that a lease cancellation notice could be regarded as a nullity because the lessor had not complied with a condition precedent to cancellation of the lease. The lease at issue stated, "In order to terminate this lease before the primary term is completed, Lessor must immediately refund the prorated Decorating Allowance to Lessee, as specified in Item #17." *Id.* at 162. The court stated, "The prefatory phrase 'in order to terminate' leaves no doubt that termination does not occur until the landlord first refunds the prorated decorating allowance. It is a condition precedent to effective termination." *Id.* at 163. Here, in contrast, the contract contains no language suggesting that Equity's obligation to pay does not arise unless CMI specifies the Repurchase Price and wiring instructions in the repurchase request.

Correspondents should follow when preparing the loan file for submission to CitiMortgage," states, "CitiMortgage's policy regarding outstanding documentation is that upon the occurrence of any one of the following events, the Correspondent shall, upon notice from CitiMortgage, immediately repurchase all affected Loan(s) from CitiMortgage at the Repurchase Price(s) specified in said notice." (Doc. 135-1, CMI Manual, § 901, at p. 2 & p. 4). Although the cited sections of the CMI Manual imply that a repurchase request will include a Repurchase Price, they do not actually impose any *obligation* on CMI to include a Repurchase Price or wiring instructions in the notification sent to Equity, nor do they condition Equity's obligation to repurchase on the inclusion of such information.

Equity also suggests that CMI's own internal policy documents show that CMI believed that the Repurchase Price and wiring instructions were necessary components of the repurchase requests. These documents are not a part of the Agreement, and to the extent that Equity attempts to rely on them to create a contractual obligation, that attempt is unavailing. Equity suggests that CMI's belief about what the Agreement meant is relevant because "[t]he construction put on a contract by the parties thereto in the course of its performance, as evidenced by their actions, is an aid to the court in determining the meaning of a contract which is ambiguous." *See Leggett v. Mo. State Life Ins. Co.*, 342 S.W.2d 833, 852 (Mo. 1960) (internal quotation marks omitted). If the language of the contract were ambiguous, evidence of CMI's understanding of its obligations under the contract might be relevant. However, the language of Section 11 is clear and unambiguous with respect to the circumstances under which Equity's obligation to pay the Repurchase Price arises, and there is no need to resort to examinations of CMI's internal documents to address that issue. *See, e.g., Cromeans v. Morgan Keegan & Co.*, 859 F.3d 558, 567 (8th Cir. 2017) (applying Missouri law) ("Where, as here, the contract is subject to only one

reasonable interpretation, 'the parties' intent may be gathered from the terms of the contract alone, and no extrinsic evidence may be introduced to contradict the terms of the contract or to create an ambiguity.'") (quoting *State ex rel. Greitens v. Am. Tobacco Co.*, 509 S.W.3d 726, 741 (Mo. 2017)).

Equity also argues that the condition precedent necessarily exists because in order to comply with any obligation to pay the Repurchase Price, Equity needed to know the amount and that how to pay it, and most of the elements needed to calculate the "Repurchase Price" were within the knowledge of CMI, not Equity. This argument is without merit. Assuming, *arguendo*, that most of the elements of the Repurchase Price were within the knowledge of CMI, not Equity, that fact does not create a contractual obligation for Equity to include the Repurchase Price in the repurchase request where none was written into the contract. Equity cites no authority in support of its position that a condition precedent is created whenever a party with a contractual obligation might require some additional information prior to performing, nor has the Court found any such authority. The contract imposed on CMI an unconditional obligation to pay the Repurchase Price after receiving the repurchase request. If Equity needed additional information (from CMI or elsewhere) in order to perform that obligation, then it was obligated to seek that information in order to perform or risk being found in breach of the contract.

Equity also suggests that CMI's failure to include the Repurchase Price prevented it from performing, citing cases holding that a party who prevents the other party from performing may not then sue for breach based on the nonperformance. *See, e.g., Weitz Co. v. MH Washington*, 631 F.3d 510, 525 (8th Cir. 2011) ("A party may not prevent another from performing on the contract and then sue for failing to perform."). Here, however, CMI did not prevent Equity from performing or make it impossible for Equity perform. At worst, CMI did not volunteer to provide information

that would have made it easier for Equity to perform. Notably, Equity does not assert that CMI refused, upon Equity's request, to give Equity any information in CMI's control that Equity needed in order to perform.

For all of the above reasons, the Court finds that Equity's contractual obligation to repurchase the Loans upon demand was not affected by CMI's failure to include the Repurchase Price amount and wiring instructions in its repurchase demands. Thus, Equity is not entitled to summary judgment based on this argument, and this argument does not provide a basis on which to deny CMI's motion for summary judgment.

## 2. Whether Equity Had a Contractual Obligation to "Repurchase" Loans That Had Been Liquidated Prior to the Repurchase Demand

Equity argues that it is entitled to summary judgment on Equity's breach of contract action as to six of the Loans at issue—the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans (collectively, the "Liquidated Loans"), because at the time of the repurchase demand, these loans had been liquidated (and the underlying property sold), and thus these loans were no longer in existence. Equity argues that it could not have had, or breached, any contractual obligation to "repurchase" the Liquidated Loans, because loans that no longer exist cannot be "repurchased" and thus are not subject to "repurchase" under the Agreement. CMI does not dispute Equity's assertion that these six loans had been liquidated (and the underlying collateral sold) at the time of the repurchase demand, nor does CMI dispute Equity's assertion that those loans no longer existed at the time of the repurchase demand. However, CMI argues that the language of the Agreement contemplates that the repurchase obligation applies regardless of the "status" of the loan at the time of the repurchase demand. CMI also argues that this issue has been resolved in its favor in other cases in this district.

The Court begins, as it must, with an examination of the language of the Agreement. As discussed above, "[t]he primary rule of contract construction is to 'ascertain the intent of the parties and give effect to that intention.'" *Whelan*, 379 S.W.3d at 846 (quoting *DeBaliviere Place Ass'n*, 337 S.W.3d at 676). "If a contract is unambiguous, 'the intent of the parties is to be discerned from the contract alone' based on the plain and ordinary meaning of the language used." *Id.* The contract should be read as a whole, and each term should be construed to avoid rendering other terms meaningless. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003). "The interpretation of an unambiguous contract is a matter for the court." *Bores v. Domino's Pizza, LLC*, 530 F.3d 671, 674 (8th Cir. 2008). "Contract terms are ambiguous only if the language may be given more than one reasonable interpretation." *Guthrie v. Hidden Valley Golf & Ski, Inc.*, 407 S.W.3d 642, 647 (Mo. Ct. App. 2013) (quoting *Holmes v. Multimedia KSDK, Inc.*, 395 S.W.3d 557 559 (Mo. Ct. App. 2013)). A term is not ambiguous merely because the parties disagree about its meaning. *Id.*

In this case, the Agreement does not define "repurchase" and does not expressly address whether CMI may demand "repurchase" of a loan that has been liquidated through foreclosure. The plain meaning of the term "repurchase" is "to buy (something) again" or "[t]he act of buying something that one previously sold or owned." *American Heritage Dictionary of the English Language* (5th ed. 2017), definition of "repurchase," available at https://ahdictionary.com/word/search.html?q=repurchase , last visited August 17, 2017). Where an agreement does not contain language that clearly compels "repurchase" of liquidated mortgage loans, several courts have held that "repurchase"—i.e., the act of buying something that one previously sold or owned—is impossible, as a matter of law, when the loan was foreclosed on and the underlying collateral was sold prior to a demand for repurchase. *See Nationwide Advantage*

*Mortg. Co. v. Mortg. Servs., III, LLC*, No. 13 C 83, 2013 WL 1787551, at \*2-\*3 (N.D. Ill. Apr. 25, 2013) (holding that the plaintiff failed to state a claim for breach of a mortgage repurchase provision where the repurchase demand was made after foreclosure and sale, because it was "impossible for [the defendant] to repurchase the Mortgage Loan or property. . . ."; rejecting the plaintiff's argument that the parties intended the word "repurchase" to incorporate within its meaning an obligation to "reimburse"); *MASTR Asset Backed Secs. Trust v. WMC Mortg. Corp.*, 2012 WL 4511065, at \*6 (D. Minn. Oct. 1, 2012) (holding that a defendant could not be compelled to repurchase mortgage loans after foreclosure and sale of the collateral, because "as a practical matter a 'mortgage loan' is a loan secured by a mortgage or deed on real property"; the court declined to "elevate form over substance to hold that a mortgage loan exists independently of the mortgage or deed of trust which secures it"); *First Place Bank v. Skyline Funding, Inc.*, No. 10 CV 2044, 2011 WL 3273071, at \*4 (N.D. Ill. July 27, 2011) (dismissing a breach of contract claim based on a failure to repurchase loans that had previously gone to foreclosure; finding "nonsensical" the plaintiff's argument that foreclosure did not alter the defendant's repurchase obligations).

Here, not only is the Agreement silent on the subject of Equity's obligation to repurchase foreclosed loans, but other provisions, like the Repurchase Price formula, suggest that the parties never contemplated that such an obligation would ever arise. The formula for calculating the Repurchase Price, which is set out in the CMI Manual and incorporated into the Agreement, states:

> **<u>REPURCHASE PRICE</u>**: The Repurchase Price is defined as the sum of: (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan; (iv) any price paid in excess of par by CitiMortgage on the funding date; and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the

repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Doc. 136-1, CMI Manual, § 2301).

It is undisputed that the Repurchase Price formula does not expressly address sale proceeds following a foreclosure. In its brief, CMI tacitly acknowledges that it would need to adjust the Repurchase Price formula to account for sale proceeds in situations where Equity was required to "repurchase" a liquidated loan, to avoid a windfall to CMI.[3] Notwithstanding CMI's arguments to the contrary, the fact that the parties did not provide for such an adjustment in the Repurchase Price formula, or elsewhere in the Agreement, demonstrates that the parties did *not* contemplate that a loan that had already been liquidated and sold could be the subject of a "repurchase" request.

The Court is not persuaded by CMI's suggestion that the inclusion of "delinquency and/or foreclosure expenses" in the Repurchase Price formula evinces an intent by the parties to allow CMI to demand, and obligate Equity to "repurchase" a mortgage loan after foreclosure and sale. As Equity points out, foreclosure expenses may include expenses incurred prior to the actual foreclosure and sale of the property, such as attorneys' fees, expenses for upkeep on the property, and title work.

CMI's reliance on Section 11 of the Agreement is also unavailing. As CMI correctly points out, Section 11 contains language that clearly contemplates CMI might be able to demand "repurchase" of a defective loan that CMI did not own.[4] However, Section 11 addresses the

---

[3] CMI states in its brief, "CMI may adjust the Repurchase Price by giving a credit for the sale proceeds the investor obtained when it liquidated the loan (as CMI has done for each of these six loans)." (Doc. 189, CMI's Mem. Opp'n S.J., at p. 44).

[4] Section 11 of the Agreement, after describing Equity's obligations when CMI requests repurchase of a defective loan, states:

> ***If such defective Loan is owned by CMI at the time of repurchase by Correspondent***, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such

*ownership* of a loan, not its status. In other words, this provision contemplates the possibility of repurchase even when CMI does not "own" the loan at issue—for example, when CMI has sold the loan to an investor and has not yet repurchased the loan from that investor. However, as Equity correctly argues, it does not contemplate the possibility of repurchase when the loan (here, a residential mortgage loan) no longer exists because the loan has been foreclosed on and the underlying property sold. To the contrary, the provision actually provides some support for Equity's position, because it suggests that the parties intended that what was to be repurchased under the Agreement was a "Loan" with transferable rights of ownership.

CMI also appears to suggest that because CMI was required to, and did, "repurchase" those loans from its investors (Freddie Mac and Fannie Mae) even after the investors had liquidated those loans, it would make no sense for the parties to have intended that Section 11 would not require Equity to repurchase those loans. That argument is also without merit, because CMI's obligations to repurchase loans from Freddie Mac and Fannie Mae are governed by agreements completely separate from the Agreement at issue in this case, and those obligations are of no relevance to the Court's interpretation of the Agreement here.[5]

---

instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

(Doc. 131-2, Agreement, ¶ 11) (emphasis added). The bolded and italicized clause clearly contemplates that CMI could demand repurchase of loans it did not own at the time of the demand.

[5] Even assuming that CMI's "repurchase" of liquidated loans from Fannie Mae and Freddie Mac were relevant, does not appear that the evidence related to those repurchase arrangements would support CMI's argument. With respect to the Liquidated Loans, Fannie Mae did *not* demand "repurchase," but instead demanded that CMI "reimburse" Fannie Mae for the loss it incurred. *See* (Docs. 140-3, 153-7, 158-9). Those letters stand in contrast to Fannie Mae's letters concerning the loans that had not been liquidated, in which Fannie Mae *did* request repurchase. (Docs. 159-9, 160-9). If anything, these letters suggest that Fannie Mae recognized that "repurchase" was not the appropriate remedy for loans that no longer existed. Freddie Mac's letters to CMI regarding foreclosed loans are also instructive. Freddie Mac did demand that CMI "repurchase" the liquidated loans at issue. (Docs. 145-2, 148-8, 156-9). However, at least some of Freddie Mac's

Finally, CMI argues that Section 11 is a risk-allocation provision and that it would make no sense for the parties to have intended that Section 11 would not apply to the most defective loans sold by Equity—those that its investors liquidated even before CMI demanded repurchase. But as Equity points out, CMI is not without a remedy in such cases. Section 11 provides that at CMI's discretion, Equity shall "agree to such other remedies (including but not limited to additional indemnification and/or a refund of a portion of the Loan purchase price) as CMI may deem appropriate." In the absence of a still-existing "loan" that could be "repurchased," CMI was free to seek such other remedies.

CMI's attempts to distinguish cases that have held it "impossible" for a seller like Equity to "repurchase" a mortgage loan that has already been liquidated are unpersuasive. For example, CMI argues that the agreement at issue in *Nationwide Advantage Mortgage Co.* did not provide plaintiff the same options available to CMI under Section 11 of the Agreement in this case. However, for the reasons set forth above, CMI's reliance on Section 11 is misplaced and the differences highlighted by CMI are of no moment to the analysis in this case. CMI also argues that this Court should not reach the same result as did the court in *MASTR Asset* because, in that case, repurchase was the exclusive remedy for breach of the agreement's representations and warranties. However, it does not appear that the court's reasoning in *MASTR Asset* was dependent in any way on the fact that repurchase was an exclusive remedy. Despite the presence of contract language that was far more favorable to CMI's position than is the language of the Agreement here, the

letters also specifically noted that the agreement between Freddie Mac and CMI expressly provided for "repurchase" of no longer active loans. For example, with regard to one loan, Freddie Mac's repurchase demand letter summarized the different repurchase procedures applicable to "Active Mortgages," "Inactive Mortgages," and "Real Estate Owned (REO) Mortgages" under the relevant agreement. (Doc. 148-8). In contrast, in the instant case, the Agreement contains no indication that loans that are no longer active or existent can be "repurchased."

court in *MASTR Asset* concluded that "reading the 'Mortgage Loan' definition to contemplate repurchase following foreclosure and sale of the collateral securing the loans would elevate form over substance, sit uneasily with other provisions of the Purchase Agreement, and be contrary to both the apparent intent of the parties and common sense." *See MASTR Asset*, 2012 WL 4511065, at *5.

CMI posits that *CitiMortgage v. Mason Dixon Funding, Inc.*, No. 4:09-CV-1997-TCM, compels a ruling in its favor. However, in *Mason Dixon Funding*, Judge Mummert merely addressed in summary fashion an argument that CMI had failed to state a claim because CMI had not alleged that it could return either the loans or the underlying security interests to the defendant.[6] The court, without analysis, found that argument to be "without merit." It does not appear that the court in *Mason Dixon Funding* squarely confronted the issue that is currently before this Court: namely, whether the Agreement at issue permits CMI to demand repurchase of loans after foreclosure and sale of the underlying collateral.

CMI also argues that other courts in this district have determined that the status of a loan is irrelevant to CMI's right to recover for a correspondent's breach of a repurchase obligation. CMI has filed an affidavit stating that in several of the cases in which CMI has previously been awarded damages for breach of a repurchase obligation, some of the loans had been liquidated

---

[6] The court's analysis of this issue in that case reads, in its entirety:

> [The defendant] raises fourteen affirmative defenses. The first is failure to state a claim. This defense is premised on an argument that CMI has failed to allege it can return the loans at issue or the underlying security interests to [the defendant]. Insofar as this argument goes to the question of damages, it is addressed below. Insofar as it goes to CMI's breach of contract claims, it is without merit.

*CitiMortgage v. Mason Dixon Funding, Inc.*, No. 4:09-CV-1997-TCM, Doc. 226, at 44 (Oct. 30, 2012).

prior to the repurchase demand.[7] CMI's reliance on those cases is misplaced. There is no indication that any of the defendants in those cases raised the argument Equity raises here (that there is no contractual obligation to "repurchase" when a demand is made after foreclosure and sale) or that any of those courts ever considered that argument. "[C]ourts are generally limited to addressing the claims and arguments made by the parties." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). In the absence of any indication that this issue was raised, briefed, or decided in those cases, those cases are of no persuasive value.

CMI's reliance on *Resolution Trust Corp., Inc. v. Key Financial Services, Inc.*, 280 F.3d 12 (1st Cir. 2002), is also misplaced. In that case, the foreclosure and sale occurred only *after* the repurchase demand was made. *Id.* at 18. The court found that damages for breach of a repurchase obligation could be awarded after foreclosure and sale; it did not address the question of whether a party could breach a contract by failing to "repurchase" a loan no longer in existence at the time of the repurchase demand. Similarly, CMI's reliance on *Orix v. Real Estate Capital Markets LLC v. Superior Bank, FSB*, 127 F. Supp. 2d 981, 983 (N.D. Ill. 2000), is unavailing. In that case, it is unclear whether the liquidation of the loans at issue occurred before the demand for repurchase. However, the breach asserted was not for breach of a repurchase obligation, but for breach of warranty. *Id.* The court simply found that even if repurchase was no longer available as a possible remedy, there was no practical difference between that remedy and compensatory damages. Here, the question is not what remedy is applicable for a breach of warranties, but rather whether a breach of an obligation to repurchase occurred.

---

[7] Out of a total of six cases, CMI identified six specific loans for which the foreclosure and sale occurred before the repurchase demand. (Amended Affidavit of Debra Behrendt, Doc. 202-1).

For all of the above reasons, the Court finds that when the Agreement is read as a whole, it is clear that the parties did not intend that Equity would be obligated to "repurchase" a loan after the loan had been foreclosed on and the underlying property sold. CMI's position that Equity was obligated to "repurchase" loans that no longer existed is contrary to the both the plain language of the Agreement and common sense. In light of the foregoing, the Court finds as a matter of law that under the Agreement, Equity did not have a contractual obligation to "repurchase" the Liquidated Loans, because at the time of the repurchase demand they had already been foreclosed on, the property underlying them had been sold, and the loans no longer existed. Thus, CMI cannot show that Equity breached the Agreement by failing to repurchase these loans. Therefore, the Court will grant Equity's motion for summary judgment, and deny CMI's motion for summary judgment, with respect to the Degrey Loan, the Dewey (Gatesville) Loan, the Dewey (Whistling Straits) Loan, the Hunt Loan, the Jensen Loan, and the Paulos Loan.

### 3. Whether Equity Had a Contractual Obligation to Repurchase Loans Where CMI Failed to Request Repurchase Within a "Reasonable Time" After Learning of the Loan Defects

Equity's next argument is that because the Agreement did not specify a time frame for CitiMortgage to demand repurchase of a defective loan, Missouri law created an implied obligation that any demand for repurchase had to be made within a reasonable time after CMI learned of the loan defects. Equity points out that under Missouri law, courts avoid construing contracts to contain perpetual rights or obligations. Equity argues that as to the twelve loans in this case, CMI did not demand repurchase of the loans within a reasonable time after learning of the loan defects, and therefore Equity is entitled to summary judgment as to all twelve loans. In the alternative, Equity argues that there are questions of fact regarding whether CMI demanded repurchase within a reasonable time that preclude the Court from granting CMI's motion for summary judgment.

CMI, on the other hand, argues that the Agreement does not create a perpetual right and that implying a "reasonable time" obligation in the Agreement would be contrary to the language of the Agreement, the parties' intent as evidenced by the language of the Agreement, and the decisions of other courts in this district.

Equity is correct that, as a general rule, "[a] contract will not be construed to impose an obligation or confer a right in perpetuity unless the language of the contract 'compels' such a construction." *Albers v. Cardinal Glennon Children's Hosp.*, 729 S.W.2d 519, 522 (Mo. Ct. App. 1987). *See also H & R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 944 (8th Cir. 2012) ("Missouri courts 'are prone to hold against the theory that a contract confers a perpetuity of right or imposes a perpetuity of obligation.'") (quoting *Paisley v. Lucas*, 143 S.W.2d 262, 270 (Mo. 1940)). Thus, "[i]n the absence of any specific time perimeters in a contract, it is clear that terms such as options shall be exercised within a reasonable time." *R.L. Pohlman v. Keystone Consol. Indus., Inc.*, 399 F. Supp. 330, 334 (E.D. Mo. 1975). *See also Magee v. Mercantile-Commerce Bank & Trust Co.*, 124 S.W.2d 1121, 1124 (Mo. 1938) ("Options which fix no time have been held void either for indefiniteness or as to perpetuities. To avoid this result, the tendency has been (when no time is designated) to establish the rule of a reasonable time under the circumstances.") (citations omitted).

However, it is also well-settled under Missouri law that "when parties reduce their agreements to writing [courts] presume that the instrument contains the entire contract, and [courts] will not imply additional provisions unless necessary to effectuate the parties [sic] clear intentions." *Giessow Rests., Inc. v. Richmond Rests., Inc.*, 232 S.W.3d 576, 579 (Mo. Ct. App. 2007). Missouri courts will find implied obligations in written contracts only where those implied obligations "rest entirely upon the presumed intention of the parties, as gathered from the terms

actually expressed in the writing itself; and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto, or it must appear that it is necessary to infer such an obligation to effectuate the full purpose of the contract." *Id.* (quoting *Conservative Fed. Sav. & Loan Ass'n v. Warnecke*, 324 S.W.2d 471, 478-79 (Mo. Ct. App. 1959)). Missouri courts will not "find an implied covenant if the parties have either dealt expressly with the matter or have intentionally left the contract silent on the point." *Id.* (quoting *Crestwood Plaza, Inc. v. Kroger,* 520 S.W.2d 93, 97 (Mo. Ct. App. 1974)). "It is not enough to conclude that an implied covenant is necessary to make the agreement fair or that without it, an agreement is unwise or will operate unjustly." *Id.*

Applying the foregoing principles to the facts of this case, the Court finds that (1) the Agreement does not create a perpetual right, even in the absence of an implied reasonable time obligation, and (2) on the facts of this case, implying a "reasonable time" obligation into the Agreement would be inconsistent with the intent of the parties, as expressed in the language of the Agreement.

First, as CMI points out, the right to demand repurchase of the Loans is not perpetual, because there are finite, practical limits on the length of time the repurchase right will continue. The longest possible time the right could continue would be the length of the original term of the loan. Additionally, as discussed above, events such as such as foreclosure and sale of the underlying collateral that occur earlier would place another practical time limit on the right to repurchase.

Moreover, the implied reasonable time limitation proposed by Equity appears to be at odds with several provisions of the Agreement. For example, Section 1 of the Agreement states,

> CMI may purchase loans with or without conducting a complete review of the Loan documentation. **CMI's review of, or failure to review, all or any portion of the**

**loan documentation shall not affect CMI's rights to demand repurchase of a loan or any other CMI right or remedy provided by this Agreement.**

(Doc. 131-2, Agreement, § 1) (emphasis added). The plain language in this provision makes clear that it was the intent of the parties that CMI's right to demand repurchase not be affected even if, early in the life of the loan, CMI reviewed and detected evidence of a loan defect.[8] Requiring CMI to request repurchase "within a reasonable time" after learning of loan defects would be contrary to Section 1 of the Agreement. Specifically, a reasonable time limitation could "affect CMI's right to demand repurchase" by creating a situation wherein CMI's "review of" the loan documentation that revealed a defect would start the ticking of a clock that would require CMI to take further action or risk forever losing its right to demand repurchase.

An implied reasonable time limitation would similarly conflict with Section 14 of the Agreement, which states:

> The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under the Agreement shall not constitute a waiver of any right including the right to insist on strict compliance in the future.

(*Id.*, § 14). Implying into the Agreement a term requiring CMI to request repurchase "within a reasonable time" after learning of loan defects would be contrary to the provision above, because it would create a situation in which CMI's failure to exercise its right to demand repurchase immediately would effectively result in the waiver of a right to demand repurchase in the future.

---

[8] It is clear that a review of loan documentation might reveal to CMI loan defects that would give rise to CMI's right to demand repurchase. For example, in arguing that CMI's repurchase demand was not made within a reasonable time for the Seemungal Loan, Equity measures the beginning of the "reasonable" time period by starting with the moment "when CMI first received the loan approval package containing the alleged lack of documentation upon which the purported defect was based." (Doc. 129, Equity's Mem. Supp. S.J., at 51).

Finally, implying a reasonable time requirement for CMI's repurchase demands appears to be at odds with the considerable discretion afforded to CMI under the Agreement in making determinations of defects under Section 11 of the Agreement. Section 11 permits CMI, "in its sole and exclusive discretion, [to] [d]etermine[]" whether any of various loan defects exist, with such a determination triggering the right to demand repurchase. The Eighth Circuit has made it clear that such discretion is "unfettered" and that courts are precluded from engaging in a "loan-by-loan analysis" to assess the "accuracy, materiality, and good faith" of CMI's loan defectiveness determinations. *See CitiMortgage, Inc. v. Chicago Bancorp., Inc.*, 808 F.3d 747, 752 (8th Cir. 2015) (finding that the district court was not permitted to engage in a loan-by-loan analysis to evaluate whether CMI's loan defect determinations were made in good faith).

Implying a "reasonable time" limitation into the contract would significantly restrict CMI's unfettered discretion under the Section 11 of the Agreement. If Equity's view were accepted, then whenever CMI was in possession of information that might reveal a loan defect, CMI would be obligated to promptly review that information, promptly make a determination that the loan was defective, and promptly demand repurchase, or else forever waive its right to do so. Such an obligation is inconsistent with the broad discretion afforded to CMI under the Agreement, as well as with the above-cited non-waiver provision and provision establishing that CMI's review of, or failure to review, loan documentation does not affect its rights under the Agreement.

In sum, the reasonable time limit proposed by Equity does not, as required under Missouri law, "rest entirely upon the presumed intention of the parties, as gathered from the terms actually expressed in the writing itself." *Giessow Rests.*, 232 S.W.3d at 579. It also does not appear from the written Agreement that a reasonable time limit "was so clearly within the contemplation of the parties" that they deemed it unnecessary to expressly make reference to it in the Agreement. *Id.*

Nor does it appear from a review of the Agreement that "it is necessary to infer" a reasonable time limit to effectuate the full purpose of the Agreement. *Id.* To the contrary, as set out above, it appears that an implied reasonable time limit would conflict with several of the provisions in the Agreement. In the absence of any indication from the Agreement that the parties contemplated the implied obligation proposed by Equity, the fact that the Agreement might "operate unjustly" or be viewed as "unfair" or "unwise" in its absence is not a basis for injecting it into the Agreement. *Id.*

The contractual provisions discussed above distinguish the instant cases from those on which Equity relies. Equity relies heavily on *Weis v. Wanstrath*, 149 S.W.2d 442 (Mo. Ct. App. 1941). In that case, the parties' agreement stated, "You will get gilt-edge first deeds of trust, and I stand back of every one; if they should not pay out, which never happens, I will take them back." *Id.* at 443. The plaintiff purchased securities from the seller, the makers of the securities defaulted, and the plaintiff waited over a year after the default before demanding repurchase. *Id.* at 443, 445-46 The court found that the buyer's delay of twelve to sixteen months before demanding repurchase was unreasonable as a matter of law and precluded the buyer from bringing a breach of contract suit. *Id.* at 446.

The agreement in *Weis* (which apparently consisted only of a short letter) did not include the contractual provisions described above. It did not provide the buyer with the "sole and exclusive discretion" to determine whether the event triggering a right to repurchase had occurred; it did not contain language specifying that the buyer's review or failure to review the loan documentation at issue would not affect its right to repurchase; and it did not contain the non-waiver provision present in the Agreement. Thus, *Weis* is of limited relevance here. The other cases relied on by Equity are similarly distinguishable. *See also Magee*, 124 S.W.2d at 1124-26 (oral contract not containing provisions similar to those in the Agreement here); *First Nat'l Bank*

*of Carrollton v. Eucalyptus*, 752 S.W.2d 456 (Mo. Ct. App. 1988) (separation agreement with no provisions similar to those in the Agreement here); *ContiMortgage Corp. v. Mortg. Am., Inc.*, 47 F. Supp. 2d 575 (E.D. Pa. 1999) (discussing mortgage repurchase agreement but not discussing a non-waiver provision and or a provision stating that the buyer's review or failure to review loan documentation would not affect the right to repurchase).

For all of the above reasons, the Court declines to imply into the Agreement a term requiring that CMI make its repurchase demands within a "reasonable" time after learning of the alleged defects. Thus, the Court finds that Equity's contractual obligation to repurchase existed regardless of whether CMI's repurchase requests were made within a reasonable time. Thus, Equity is not entitled to summary judgment based on this argument, and this argument does not provide a basis on which to deny CMI's motion for summary judgment.

### 4. Whether CMI Is Entitled to Summary Judgment on the Amount of Its Damages

Equity's next argument is that CMI is not entitled to summary judgment on the question of damages because CMI has not established the lack of any genuine issue of fact as to its calculation of the "Repurchase Price" for each of the twelve loans. The Court agrees.

Equity does not dispute CMI's assertion that the Repurchase Price, as defined in the CMI Manual (incorporated by reference into the Agreement), is the appropriate measure of damages for CMI's breach of contract claims. However, Equity asserts that the evidence that CMI has submitted in support of its calculation of the Repurchase Price deviates from the Repurchase Price formula contained in the contract and includes significant amounts of inadmissible evidence.

To support its Repurchase Price calculations, CMI submitted the affidavit of Mr. Isaac Miller, a Senior Repurchase Coordinator at CMI. Equity argues that several of Mr. Miller's calculations appear to be at odds with both the Repurchase Price formula and/or with some of Mr.

Miller's own deposition testimony. Specifically, Equity challenges Mr. Miller's calculation of elements (ii), (iii), and (iv).[9]

The Court first addresses Equity argument that Mr. Miller's calculation of element (iv) is incorrect—an argument that applies to all twelve loans. As discussed above, element (iv) adds to the Repurchase Price for each loan "any price paid in excess of par by CitiMortgage on the funding date." In his deposition, Mr. Miller testified as follows:

> Q:    All right. I'm going to go onto the fourth element of the repurchase price formula which is, "any price paid in excess of par by CitiMortgage on the funding date." Can you tell me what "par" is?
>
> A:    "Par" is the basic cost of the loan.
>
> Q:    So the basic cost of the loan?
>
> A:    Yes. The loan amount.
>
> . . .
>
> Q:    Would the par refer to the amount that the borrower borrowed on the loan?
>
> A:    Yes.
>
> Q:    All right. So the price paid in excess of par by CitiMortgage, would that they refer to any amount that CitiMortgage paid to purchase the loan that was in excess of the amount that the borrower borrowed on the loan as of on the funding date?
>
> A:    Yes.

(Doc. 187-1, Miller Dep., 53:12-19, 54:5-13). When Mr. Miller was asked to identify on a particular Purchase Advice form[10] the amount that the borrower borrowed on the loan ("par,"

---

[9] The parties' specific arguments on this point are largely contained within the briefing on Equity's Objections to and Motion to Strike Portions of Affidavit of Isaac Miller (Doc. 187), which is referenced in the summary judgment briefing. The Court has considered the arguments in the briefing on the motion to strike in making its decision.

[10] The Purchase Advice form is a CMI business record CMI creates when it purchases a loan or group of loans.

according to Mr. Miller) and the amount CitiMortgage actually paid to purchase the loan, Mr. Miller pointed to the amounts listed on the "Purchase Principal" and "Total Due Seller" lines, respectively. For example, for the Degrey Loan, Mr. Miller testified as follows:

> Q:    All right. And if you take a look at the document, there's a—there's a line about halfway down the page in bold saying "Summary of Loan Charges." And just under that says "Purchase Principal," and then over to the right, it says "$342,000." Do you see that?
>
> A:    Yes.
>
> Q:    Okay. Is it your understanding that that reflects the amount of money that was borrowed by the borrower?
>
> A:    Correct.
>
> Q:    All right. And if you go down to the bottom of the page, towards the bottom, there's a line for "Total Net Due Seller." Do you see that?
>
> A:    Yes.
>
> Q:    And the amount reflected there is "$343,747.04." That would have been the amount that CitiMortgage paid for this loan; correct?
>
> A:    Correct.

(*Id.*, 84:1-24). When Mr. Miller was asked similar questions about other loans, he offered similar testimony. (*Id.*, 130:14-25, 131:1-4; 148:17-25, 149:1-12; 161:11-25, 162:1-2; 168:25, 169:1-15, 178:12-25, 179:1; 208:15-25, 209:1-2).

As Equity points out, based on the text of the Repurchase Price formula and Mr. Miller's testimony about the meaning of the terms in that formula, it would appear that the "price paid in excess of par by CitiMortgage on the funding date" would be calculated by subtracting the "Purchase Principal" amount from the "Total Net Due Seller" amount. For the Degrey Loan, this would have been $343,747.04 (the Total Net Due Seller) minus $342,000 (the Purchase Principal), for a difference of $1,747.04. However, in his affidavit in support of summary judgment, Mr.

Miller's calculation is different—he states that element (iv) adds $3,847.50 to the Repurchase Price for the Degrey Loan. (Doc. 131-1, Miller Aff., ¶ 85).

In his affidavit submitted in support of summary judgment, Mr. Miller explains element (iv) as follows:

> The "price paid in excess of par by CitiMortgage" element of the Repurchase Price formula refers to a negotiated amount or "premium" that CMI pays to the Correspondent, when purchasing a loan, in excess of the Current Principal Balance of the loan at the time of purchase. This premium is also referred to as a market and/or service release premium." The "market and/or service release premium" is equal to the amount of the "Client Base Price" plus SRP plus the "Price Adjustments," if any, as reflected on the purchase advice.

(*Id.*, ¶ 78). As an example, Mr. Miller's calculation of element (iv) for the Degrey Loan involved taking the sum of the "Client Base Price" ($13,680) and the Service Release Premium ($0), minus the "negative price adjustments" in the amount of $9,832.50 reflected on the Purchase Advice, for a total of $3,847.50. (*Id.*, ¶ 85). Mr. Miller's calculation of element (iv) for other loans were similar. (*Id.*, ¶¶ 91, 97, 103, 108, 114, 120, 126, 131, 137, 143, & 149). It is not clear to the Court why Mr. Miller used those numbers to calculate element (iv) or how those calculations can be reconciled with his testimony regarding his understanding of the terms "par" and "the amount that CitiMortgage paid" as used in the Repurchase Price formula.

CMI attempts to explain Mr. Miller's calculation of the Repurchase Price by arguing that it is "derived straight from the Purchase Advice for each loan." (Doc. 198, at p. 4). That may be correct. However, CMI does not adequately explain, nor can the Court discern from Mr. Miller's deposition testimony, how Mr. Miller's calculation is consistent with the *Repurchase Price formula in the Agreement*. Based on the evidence currently before the Court, Mr. Miller's calculation appears to be at odds with the language of the Agreement and with his own deposition testimony. At a minimum, given the lack of clarity regarding whether Mr. Miller's calculations

are consistent with the language of the Agreement, CMI has not established that there is an absence of genuine issues of material fact as to the question of damages or that it is entitled to judgment as a matter of law on the question of damages as to any of the twelve loans. Accordingly, the Court will deny CMI's motion for summary judgment with respect to damages. [11]

### 5. Whether CMI's Claims Are Barred by the Statute of Limitations

Equity next argues that it is entitled to summary judgment on CMI's breach of contract claims with respect to all of the Loans on the ground that CMI's lawsuit is barred by the relevant statute of limitations.[12] In its own motion for summary judgment, CMI argues that its claims were timely filed. The parties agree that the relevant statute of limitations is determined by Missouri law. However, the parties dispute both when CMI's cause of action accrued for purposes of the statute of limitations and whether the applicable limitations period is five years or ten years.[13] Because the Court finds that CMI's claims were timely filed even under the five-year statute of limitations, the Court need not resolve the question of which statute of limitations applies.

---

[11] Because CMI has not established that it is entitled to summary judgment on the question of damages as to any of the twelve loans, the Court need not address the other specific problems Equity has with Mr. Miller's calculations, some of which apply only to particular loans or subsets of loans. In addition, the Court notes that Equity's first and second arguments appear to address only the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos loans. (Doc. 187, Motion to Strike, pp. 6-9.). The Court has already granted summary judgment in Equity's favor on those loans, so those arguments are no longer relevant.

[12] The statute of limitations is an affirmative defense, [and defendants] who move for summary judgment on that basis bear the burden of showing that it bars plaintiff's claims." *Dowell v. Lincoln Cty.*, 927 F. Supp. 2d 741, 754 (E.D. Mo. 2013) (quoting *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 580 (Mo. 2006)).

[13] Equity's position is that the CMI's claims are governed by Missouri's generally applicable statute of limitations for contract actions, which requires an action to be brought within five years. *See* Mo. Rev. Stat. § 516.120(1). CMI's position is that its claims are governed by the statute of limitations that applies to an action upon a writing for the payment of money, which requires an action to be brought within ten years. *See* Mo. Rev. Stat. § 516.110(1).

The Court begins with the question of when CMI's cause of action accrued. Under Missouri law, "the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and capable of ascertainment, and if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." Mo. Rev. Stat. § 516.100. "[T]he requirement that damages be sustained and capable of ascertainment does not change the tenet that when an injury is complete as a legal injury, the period of limitations commences at once." *Vandenheuvel v. Sowell*, 886 S.W.2d 100, 102-03 (Mo. Ct. App. 1994). The Missouri Supreme Court also recently stated that "[a] cause of action for breach of contract does not accrue until a breach of contract occurs." *Spalding v. Stewart Title Guar.Co.*, 463 S.W.3d 770, 775 (Mo. 2015).

Equity's position is that CMI's cause of action for breach of contract accrued, and the statute of limitations began to run, as soon as Equity's sale of defective loans to CMI became capable of ascertainment, such that CMI could have brought a lawsuit for breach of the Agreement. Equity argues that the evidence shows that each loan's defects were capable of ascertainment more than five years before CMI filed the instant lawsuit, so CMI's claims are time-barred.

CMI contends that Equity's position is based on the incorrect premise that the breach of contract at issue here was the sale of defective loans (a breach of the representations and warranties in Section 2 of the Agreement), instead of the breach of contract that CMI is actually asserting— a breach of Section 11's cure-or-repurchase provision. CMI argues that its cause of action for breach of Section 11 could not have accrued until Equity had actually breached Section 11 by failing to cure or repurchase a defective loan after receiving a demand from CMI. CMI argues that

because that failure occurred, for each loan, within five years before CMI filed the instant lawsuit, CMI's claims are timely.

As both parties acknowledge, another court in this district recently addressed precisely this issue, in a case involving identical contractual language, and concluded that CMI's cause of action for a breach of Section 11's cure-or-repurchase obligation did not accrue until the defendant failed to cure or repurchase an allegedly defective loan. *CitiMortgage, Inc. v. Chicago Bancorp., Inc.*, No. 4:14-CV-1278-AGF, 2016 WL 3346566, at *7 (E.D. Mo. June 16, 2016), *vacated in part on other grounds upon reconsideration*, 2016 WL 3958594 (E.D. Mo. July 22, 2016). In her analysis, Judge Fleissig began by analyzing the language of the contract to determine when the "breach" at issue had occurred. She stated:

> Section 11 sets forth an independent obligation that is not dependent upon or derivative of, for instance, Section 2's representations and warranties. Section 11's cure-or-repurchase provision provides CMI the sole and exclusive discretion to declare one or more of the listed defects and to demand cure or repurchase, separate and apart from [the defendant's] representations and warranties in other sections of the Agreement. The Eighth Circuit, interpreting both Missouri law and comparable Minnesota law, has suggested that cure-or-repurchase provisions akin to Section 11 are not merely procedural prerequisites, but independent and contractual obligations, **the breach of which occurs upon the seller's failure to cure or repurchase**.

*Id.* at *7-*8 (citing *Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910, 916 (8th Cir. 2013), & *CitiMortgage v. Chicago Bancorp, Inc.*, 808 F.3d 747, 749 (8th Cir. 2015)).

Based on her finding that Section 11 sets forth an independent contractual obligation that may be breached, Judge Fleissig distinguished the series of New York cases cited by the defendant in which courts had found that a cause of action accrued at the time a defective loan was delivered rather than at the time a repurchase demand was refused. *Id.* She stated:

> [T]he contracts at issue in [the New York cases relied on by the defendant] did not contain a provision like Section 11, granting the purchaser the "sole and exclusive discretion" to determine whether a loan was defective so as to require cure or

repurchase. Rather, the repurchase provisions in these cases stated only that they were a "remedy" for breach of representations and warranties contained in a separate section of the contract that were breached, if at all, on the date the non-complying loan was purchased. In these cases, the only cause of action was for a breach of representation or warranty, and the remedy for such a breach was limited to repurchase. Therefore, the courts held that "the cure or repurchase obligation was not an independently enforceable right" but was merely "a procedural prerequisite" to filing suit for breach of a representation or warranty.

*Id.* (citations omitted).

Finally, Judge Fleissig reasoned that accepting the defendant's argument would lead to a result contrary to the terms of the Agreement and the Eighth Circuit's interpretation of the Agreement:

If the breach at issue in this case were truly the underlying sale of the defective loan, as [the defendant] asserts, the Court or a jury would have to determine whether each loan was in fact defective under the terms of the Agreement. But Section 11 "contract[s] away" this judicial review and creates a new breach, based on [defendant's] failure to cure or repurchase a loan that CMI has, in its sole and exclusive discretion, determined is defective. *See Chicago Bancorp I*, 808 F.3d at 751. The New York cases cited by [the defendant] do not contain such a provision, and [the defendant] has not cited any other authority persuading the Court that the statute of limitations accrued upon the sale of the loans in this case. As such, the Court finds that CMI's repurchase claims accrued upon [the defendant's] failure, after notification and an opportunity to cure, to cure or repurchase the defective loans.

*Id.* at *8.

The Court finds Judge Fleissig's decision persuasive and agrees with her reasoning and conclusions.[14]  Both the language of the Agreement and other cases from this district make it clear that Section 11 contains an independent contractual obligation, not simply a remedy for a breach of Section 2. *See CitiMortgage, Inv. v. Just Mortg., Inc.*, No. 4:09 CV 1909 DDN, 2012 WL

---

[14] The Court recognizes that it is not bound by Judge Fleissig's decision. *See Camreta v. Greene*, 563 U.S. 692, 708 n. 7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting 18 J. Moore et al., *Moore's Federal Practice* § 134.02[1][d], pp. 134-26 (3d ed. 2011)).

1060122, at *13 (E.D. Mo. Mar. 29, 2012) ("Section 2(i) and 2202 are breached when a correspondent knows or should have known that loan documents contain misstatements, misrepresentations, or omissions but nonetheless submits the defective documents to CitiMortgage. . . . Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.").[15] CMI's cause of action here is a breach of contract action based on Section 11 of the Agreement. Under Missouri law, and a matter of common sense, that cause of action could not have accrued until the actual breach of Section 11 occurred. *See Spalding*, 463 S.W.3d at 776 ("A cause of action for breach of contract does not accrue until a breach of contract occurs."). A breach of Section 11 did not occur until CMI made a determination of a loan defect, CMI gave Equity notice and an opportunity to cure, CMI requested repurchase of a loan, and Equity failed to repurchase the loan. Thus, the cause of action asserted in this case did not accrue until Equity failed to repurchase the loans.

The Court acknowledges that its holding does, to some extent, allow CMI to control when its claims accrue by permitting CMI to decide when it makes a determination of loan defect exists and when to demand repurchase—a situation that has generally been disfavored by Missouri courts. *See M&D Enters., Inc. v. Wolff*, 923 S.W.2d 389, 398-99 (Mo. Ct. App. 1999) ("The possibility of control of the statute of limitations by parties has been considered by Missouri courts in interpreting § 516.100 so as to avoid that possibility," because "[s]uch control would destroy the value of the statute of limitations as a statute of repose."). However, that is the arrangement Equity agreed to when it entered into an Agreement containing a contractual obligation that could

---

[15] Significantly, a breach of Section 11 may occur even without a breach of Section 2 having occurred—for example, where CMI, in its sole and exclusive discretion, makes a good-faith but erroneous determination that a loan is defective, CMI gives Equity notice and opportunity to correct or cure, Equity fails to correct or cure, CMI demands repurchase, and Equity fails to repurchase.

arise, at the other party's sole and exclusive discretion, at any point during the life of the loans at issue. The general policy concerns underlying the statute of limitations cannot override the plain language of the contract and cannot support a holding that a party must sue for a breach of contract before the breach has even occurred. Moreover, the Court notes that Equity still has the right to know that no claim will be filed against it after a certain time—that time is simply measured by the date Equity fails to repurchase upon request, rather than by some earlier date.[16]

The Court is unpersuaded by Equity's arguments for why the statute of limitations accrued when Equity's sale of defective loans to CMI became capable of ascertainment. First, Equity suggests that because CMI's cause of action based on a breach of Section 11 involves the same facts (the alleged defects in the loans) and injury (CMI being left with defective loans) as a cause of action for breach of Section 2, both causes of actions accrued at the time CMI could have maintained a suit based on the earlier breach. This argument is unavailing. Although it appears likely that CMI had ascertainable damages and could have maintained a "cause of action" under the Agreement for breach of Section 2 prior to Equity's failure to repurchase the loans, the relevant question is when CMI could have maintained *the cause of action it now asserts*, which is based on a breach of Section 11. Proving that breach requires proving different facts than does proving a breach of Section 2.

The cases relied on by Equity are distinguishable because they did not involve two, or more, distinct contractual obligations. For example, in *Hopmeier v. First Am. Title Ins. Co.*, 856 S.W.2d 387 (Mo. Ct. App. 1993), in which the court found that a breach of an agreement to

---

[16] As discussed above, the Court also notes that there is a practical limit on the time when Equity might be subject to a suit for a breach of Section 11's repurchase obligation, because CMI may not demand repurchase after the loan no longer exists (either because its original term ended or because it ceased to exist after foreclosure or some other event).

guarantee title was breached at the time the buyer became aware of the title defect, rather than at some later date, the provision to guarantee title was the was only possible contractual provision that could have been breached. Similarly, the court in *Spalding* simply did not have occasion to address a scenario like the one here, in which a contract contains two distinct contractual obligations, both of which might have been breached, and a breach of contract suit has been brought based on only one of them. *See Spalding*, 463 S.W.3d at 776. Equity cites no Missouri cases finding that where a contract contains two distinct (but related) contractual obligations, the accrual of a claim based on a breach of one contractual obligation starts the running of the statute of limitations as to a claim based on a breach of the other obligation. The Court agrees with CMI that the legal injury to CMI was not complete until Equity refused to repurchase the defective loans as required by Section 11, and that the damages resulting from a breach of Section 11 could not have occurred until the actual breach of Section 11 occurred.

Next, Equity argues CMI's claim could accrue before CMI made demand because demand was not a prerequisite to bringing a breach of contract claim, and even if it were, nothing in the Agreement prevented CMI from making demand shortly after its damages were ascertainable. Again, however, this argument is based on the incorrect premise that CMI's cause of action is one for a breach of Section 2. Demand was not a prerequisite to bringing a cause of action for breach of Section 2. However, it is clearly a prerequisite for bringing a cause of action under Section 11. As discussed above, Equity's contractual obligation to cure or repurchase did not arise in the first place until the repurchase demand was made.[17]   Moreover, as Judge Fleissig discussed, the

---

[17] This distinguishes the instant case from those on which Equity relies, in which there was no contractual language requiring demand (and no contractual language permitting the plaintiff to make an independent determination of a problem, in its sole and exclusive discretion, before making demand). *See Landis v. Saxton*, 16 S.W. 912, 913 (Mo. 1891) (holding that a cause of action to recover money from the director of a corporation accrued upon the dissolution of the

language and structure of the Agreement shows that demand is not merely a procedural prerequisite to bringing suit, but a substantive condition that must occur before a contractual obligation arises.

Third, Equity argues that this Court should follow several cases from other jurisdictions (mostly applying New York law)[18] in which courts found that the cause of action for breach of contract accrued prior to a demand for repurchase. The Court disagrees. An examination of those cases shows that (as Judge Fleissig found) in at least the vast majority of them, the structure and language of the contract indicated that the repurchase provision was a remedy that became available, if at all, upon the breach of the obligation to deliver defect-free loans. *See, e.g., U.S. Bank Nat'l Ass'n v. Equity Bank*, No. 12:CV-02023-DWF-HB, at pp. 13-14 (D. Minn. Mar. 2, 2015) (applying Kansas law) (Doc. 122-37) (contract provided that repurchase was the "sole remedy" for losses incurred in connection with the loan); *ACE Securities Corp. Home Equity Loan Trust*, 5 F. Supp. 3d 543, 548-49 (S.D. N.Y. 2014) (contract provided for repurchase in the event of a "breach of any of the representations and warranties" and stated that the cure-or-repurchase provision obligations "constitute the sole remedies" for such a breach); *Lehman Bros. Holdings,*

_____

corporation, not when demand for the money was refused; noting, "If a creditor has the means at all times of making his cause of action perfect, it would be unjust and oppressive to hold that he could postpone indefinitely the time for enforcing his claim by failing to present it. He is really and in fact able at any time to bring an action when he can by his own act fix the time of payment. It is no stretch of language to hold that a cause of action accrues, for the purpose of setting the statute in motion, as soon as the creditor, by his own act and in spite of the debtor, can make demand payable."); *Arst v. Barken, Inc.*, 655 S.W.2d 845, 848 (Mo. Ct. App. 1983) (rejecting the plaintiffs' arguments that their cause of action did not arise until they gave defendant notice of a breach and opportunity to repair).

[18] Equity also cites one case applying Kansas law and coming to a similar conclusion. *See U.S. Bank Nat'l Ass'n v. Equity Bank*, No. 12:CV-02023-DWF-HB (D. Minn. Mar. 2, 2015) (applying Kansas law) (Doc. 122-37). Equity suggests that a court applying Delaware law reached the same conclusion as well, although a close examination of that case reveals that that case actually applied New York law to the question of when the statute of limitations accrued. *See Lehman Bros. Holdings, Inc. v. Univ. Am Mortg. Co.*, No. 13-CV-0092-WJM-BNB, 2014 WL 4269118, at *6 (D. Colo. Aug. 28, 2014).

*Inc. v. Universal Am. Mortg. Co.*, Civ. No. 13-CV-00092-WJM-BNB, 2014 WL 4269118, at *3 (D. Colo. Aug. 28, 2014) (applying New York law) (noting that repurchase and indemnification obligations were "merely pre-suit contractual remedies"); *Wells Fargo Bank, N.A. v. JP Morgan Chase Bank*, N.A., No. 12-CIV-06168 (MGC), 2014 WL 1259630, at *2 (S.D. N.Y. Mar. 27, 2014) (contract provided that demand for repurchase was "the sole remedy" in the event of a breach of representations and warranties); *Aurora Comm. Corp. v. Standard Pacific Mortg.*, No. 12-CV-3138-WJM-KLM, 2014 WL 1056383, at *5 (D. Colo. Mar. 19, 2014) (applying New York law) (contract provided for repurchase "in the event of a breach" of the representations and warranties); *Deutsch Alt-A Secs. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 491-93 (S.D. N.Y. July 24, 2013) (contract provided that repurchase obligation was the "sole remedy" for a breach of representations and warranties); *Lehman Bros. Holdings v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011) (obligation to repurchase "only triggered by a breach of any of the representations, warranties, or covenants . . . .") (quotation marks omitted); *ACE Secs. Corp.*, *Home Equity Loan Trust v. DB Structured Products, Inc.*, 36 N.E.3d 623, 628-29 (N.Y. Ct. App. 2015) ("Although parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date, the repurchase obligation undertaken by DBSP does not fit this description . . . It was dependent on, and indeed derivative of, DBSP's representations and warranties, which did not survive the closing and were breached, if at all, on that date.").

In contrast, in the instant case, the Agreement does not describe the repurchase provision as a remedy for breach of Section 2's obligation to deliver defect-free loans. Instead, as discussed above, it is a separate contractual obligation that is triggered only when several events have occurred: CMI has determined, in its sole and exclusive discretion, that one of the listed defects

exists that would permit it to demand repurchase; CMI has given Equity notice and an opportunity to cure; CMI has demanded repurchase; and Equity has failed to repurchase. Accordingly, the Court finds these cases from other jurisdictions to be distinguishable. Moreover, to the extent that any of those cases are not distinguishable from the instant case, the Court disagrees with their reasoning and will not follow them.

For all of the above reasons, the Court finds that the statute of limitations for CMI's cause of action for breach of contract as to each loan accrued as to at the time that Equity failed to repurchase the loan. The undisputed evidence shows that Equity's failure to repurchase occurred within five years of the filing of the instant lawsuit with regard to each loan. Thus, CMI's lawsuit was timely filed under either the five-year statute of limitations or the ten-year statute of limitations, and the Court need not decide which statute of limitations is applicable here. With respect to the affirmative defense of the statute of limitations, Equity's motion for summary judgment is denied, and CMI's motion is granted.

### 6. Failure to Mitigate Damages

In CMI's motion for summary judgment, CMI asserts that there are no genuine issues of material fact as to Equity's affirmative defense that CMI failed to mitigate damages. In its opposition brief, Equity argues there are genuine issues of material fact as to mitigation of damages with respect to the six Liquidated Loans: the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans. However, because the Court has already granted summary judgment in Equity's favor with respect to those six loans, the issue of mitigation of damages as to those loans is moot.

Equity does not assert that there are any genuine disputes of material fact as to mitigation of damages with respect to the Hanson, Henry, Jensen, Loucks, Rivers, and Seemungal loans.

Thus, the Court will not deny CMI's motion for summary judgment as to those six loans based on a failure to mitigate damages.

### IV.    CONCLUSION

For all of the reasons stated above, the Court finds that Equity Bank has established that there are no genuine issues of material fact and Equity is entitled to judgment as a matter of law on CMI's breach of contract claims with respect to the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans. The Court further finds that CMI has established that there are no genuine issues of material fact and CMI is entitled to judgment as a matter of law on the question of liability on CMI's breach of contract claims for the Hanson, Henry, Jensen, Loucks, Rivers, and Seemungal Loans. However, the Court finds that neither party has established that it is entitled to judgment as a matter of law with respect to the question of damages related to the Hanson, Henry, Jensen, Loucks, Rivers, or Seemungal Loans.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Equity Bank, N.A.'s Motion for Summary Judgment (Doc. 115) is **GRANTED IN PART and DENIED IN PART**. With respect to the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans, it is **GRANTED**. With respect to the Hanson, Henry, Jensen, Loucks, Rivers, and Seemungal Loans, it is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff CitiMortgage, Inc.'s Motion for Summary Judgment (Doc. 123) is **GRANTED IN PART and DENIED IN PART**. With respect to the Degrey, Dewey (Gatesville), Dewey (Whistling Straits), Hunt, Jensen, and Paulos Loans, it is **DENIED**. With respect to the Hanson, Henry, Jensen, Loucks, Rivers, and Seemungal Loans, it is **GRANTED** with respect to liability and **DENIED** with respect to damages. The Court will issue

a separate order setting a conference to address the appropriate next steps for resolving the outstanding damages question.

**IT IS FURTHER ORDERED** that Defendant Equity Bank, N.A.'s Motion to Strike Portions of Affidavit of Isaac Miller. (Doc. 187) is **DENIED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of August, 2017.