UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CITIMORTGAGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-CV-230-SPM |
| | ) | |
| EQUITY BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff CitiMortgage, Inc.'s ("CMI's") Motion for Reconsideration. (Doc. 226). The motion is fully briefed and ready for disposition. For the reasons stated below, the motion will be denied.

**I.    BACKGROUND**

This case involves CMI's claim that Equity Bank, N.A. ("Equity") breached its contract with CMI (the "Agreement") when Equity failed to repurchase from CMI twelve residential mortgage loans that CMI had purchased from Equity.[1] Both parties moved for summary judgment. In its Memorandum and Order addressing the parties' motions for summary judgment (the "Partial Order"), the Court granted summary judgment in favor of Equity with respect to six of the twelve loans—those six loans that had been foreclosed on prior to CMI's demand that Equity repurchase them (the "Liquidated Loans").[2] After analyzing the language of the Agreement, the Court

---

[1] The specific facts of this case are set forth in this Court's Memorandum and Order dated August 18, 2017, and they will not be repeated in detail here.

[2] The Court also made several other rulings not relevant to the instant motion for reconsideration.

1

concluded that Equity did not have a contractual obligation to "repurchase" the Liquidated Loans. In the instant motion for reconsideration, CMI contends that conclusion was erroneous.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 54(b), an order that adjudicates fewer than all the claims in an action "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." In addition, the Eighth Circuit has held that a district court has "the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment" *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (internal quotation marks omitted). "Under Rule 54(b), a district court may, in its discretion, reconsider an interlocutory order to correct any clearly or manifestly erroneous findings of fact or conclusions of law." *Davenport v. Charter Commc'ns, LLC*, No. 4:12-CV-00007-AGF, 2013 WL 992328, at *2 (E.D. Mo. Mar. 13, 2013) (internal quotation marks omitted); *see also Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, No. 4:00-CV-1073-CEJ, 2011 WL 1599550, at *1 (E.D. Mo. Apr. 27, 2011). However, "[a] motion for reconsideration is not a vehicle to identify facts or legal arguments that could have been, but were not, raised at the time the relevant motion was pending." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 923 (8th Cir. 2015).

## III. DISCUSSION

CMI argues that the Court's conclusion that Equity had no contractual obligation to repurchase the Liquidated Loans was erroneous for several reasons. Many of CMI's arguments in support of its motion for reconsideration are arguments that, albeit reframed, were raised and addressed in the Partial Order. However, CMI's motion also appears to assert new arguments regarding this Court's interpretation of key contract terms such as "Loan" and "repurchase." CMI also appears to raise a new argument regarding the impact of this Court's interpretation on purpose

and function of the contract as a whole and asserts that Judge Cohen's decision in *CitiMortgage, Inc. v. Royal Pacific Funding Corp.*, No. 4:16-CV-00210-PLC, 2017 WL 3116135, at *8-*9 (E.D. Mo. July 21, 2017), warrants reconsideration and a reversal of this Court's decision as to the Liquidated Loans. While I find that these new arguments warrant consideration, for the reasons set out below, I find that the Partial Order was not erroneous.

### A. The Meaning of the Term "Loan"

In moving for reconsideration, CMI contends the Court erred by limiting the definition of "Loan" to a residential mortgage loan that would cease to exist after foreclosure. More specifically, CMI argues that, as used in the Agreement, the term "Loan" encompasses both a residential mortgage loan before foreclosure, as well as any rights and obligations that might continue to exist after that loan has been foreclosed on. *See* Doc. 226, at 12. CMI argues that the Court's interpretation of the term "Loan" was narrower than intended by the parties and was based on a fundamental misunderstanding of the nature of the term "Loan," as used in the Agreement, and of mortgage principles generally.

The Court does not take issue with CMI's position that, in general, even after a residential mortgage loan has been foreclosed on, there are rights and obligations that have value and continue to exist. However, in interpreting the Agreement, this Court must apply the cardinal rule of contract interpretation under Missouri law and seek to determine the parties' intent and give effect to it, first, by examining the words in the Agreement. *See Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. 2013) ("[T]he primary rule of contract interpretation is that courts seek to determine the parties' intent and give effect to it."). "The parties' intent is presumed to be expressed by the plain and ordinary meaning of the language of the contract. When the language of a contract is clear and unambiguous, the intent of the parties will be gathered from the contract

3

alone, and a court will not resort to a construction where the intent of the parties is expressed in clear and unambiguous language." *Id.* at 226-27. As such, so long as the language in the Agreement is clear and unambiguous, this Court may not resort to general mortgage industry principles or other extrinsic evidence to determine what the parties intended. *See Renco Gp., Inc. v. Certain Underwriters at Lloyd's, London*, 362 S.W.3d 472, 477 (Mo. Ct. App. 2012) ("Unless the contract is ambiguous, the intent of the parties is determined based on the contract alone, not on extrinsic or parol evidence.").

The Agreement in this case is not ambiguous. As relevant here, a "Loan" is defined in the Agreement as a "residential mortgage loan." Although the Agreement does not further define the term "residential mortgage loan," the plain and ordinary meaning and use of the term "mortgage loan" is "[a] loan secured by a mortgage or deed of trust on real property." Black's Law Dictionary (10th ed. 2014). *See also MASTR Asset Backed Secs. Trust v. WMC Mortg. Corp.*, 2012 WL 4511065, at *4 (D. Minn. Oct. 1, 2012) ("As a general proposition, a 'mortgage loan' is a 'loan secured by a mortgage deed of trust on real property.'") (quoting Black's Law Dictionary (9th ed. 2009)).

CMI does not challenge the conclusion in the Partial Order that a residential mortgage loan, as that term is ordinarily applied, would cease to exist after foreclosure. Indeed, in describing the foreclosure process in its brief, CMI tacitly concedes that, after foreclosure, there is no longer a mortgage loan in existence, because there is no longer a "loan secured by a mortgage or deed of trust on real property." Instead, the loan secured by a mortgage or deed of trust on real property has been replaced by something else—ownership of a piece of real property (or the proceeds from sale of that property) and a right to collect a deficiency judgment if there is a deficiency.

The parties to the Agreement in this case could certainly have adopted a more expansive definition of the term "Loan" to encompass both a residential mortgage loan and any rights and obligations that continue to exist following a foreclosure. However, the parties did not do so. CMI has failed to point to any supportive language in the Agreement and the Court's review of the Agreement has revealed no such language.

The Court has considered, but rejects, CMI's new argument that the definition of "mortgage" in the Fannie Mae Selling Guide requires the Court to accept CMI's more expansive definition of a "Loan." The Selling Guide, which CMI asserts is incorporated by reference into the Agreement, defines "mortgage" as follows:

> Collectively, the security instrument, the note, the title evidence, and all other documents and papers that evidence the debt (including the chattel mortgage, security agreement, and financing statement for a cooperative share loan); an individual secured loan that is sold to us for retention in our portfolio or for inclusion in a pool of mortgages that backs a Fannie Mae-guaranteed mortgage security. The term includes a participation interest where context requires.

Doc. 226-2, at p. 21. Even assuming that the Selling Guide's definition of "mortgage" somehow informs the meaning of the term "Loan" or "residential mortgage loan" it does not assist CMI. The Selling Guide's definition suggests that a mortgage consists of the totality of the components described. Even if this language could be construed to suggest that a mortgage consists of multiple components that may include rights and obligations following a foreclosure, it does not suggest that some subset of those components would themselves constitute a "mortgage" or residential mortgage loan.

In sum, CMI has pointed to no language in the Agreement that supports CMI's position that the creditor's rights or liquidation proceeds that may remain after a foreclosure fall within the Agreement's definition of a "Loan." Instead, as set out above, the Agreement defines a "Loan" as

5

a "residential mortgage loan" which—as that term is ordinarily used—is a loan secured by a mortgage or a deed of trust on real property that ceases to exist after foreclosure.

### B. The Meaning of the Term "Repurchase"

CMI also argues that the Partial Order was based on a fundamental misapprehension of the meaning of the term "repurchase," as that term is used in the Agreement. More specifically, CMI contends that, as used in the Agreement, the term "repurchase" is a "term of art" used in the secondary mortgage industry, and that as such, this Court erred when it relied on a dictionary definition of "repurchase."[3] However, "repurchase" is not defined in the Agreement, and under Missouri rules of contract interpretation, "[t]he parties' intent is presumed to be expressed by the plain and ordinary meaning of the language of the contract." *Chochorowski*, 404 S.W.3d at 226.

The Agreement in this case provides, in relevant part, that if CMI identifies any of several defects in a Loan that Equity sold to CMI, and Equity cannot cure the defects in that Loan:

> [Equity] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate.

Agreement § 11.

Without citing any specific language in the Agreement, CMI repeatedly emphasizes that the obligation to repurchase is an "independent contractual obligation" that "applies regardless of whether a Loan is active or has gone through foreclosure and collateral sale." Doc. 226, at 9.[4]

---

[3] At least one other court has relied on a similar dictionary definition to interpret the meaning of "repurchase" in a mortgage repurchase contract. *See Nationwide Advantage Mortg. Co. v. Mortg. Servs. III, LLC*, No. 13 C 83, 2013 WL 1787551, at *2 (N.D. Ill. Apr. 25, 2013) ("[T]he definition of 'repurchase' is the 'act or an instance of buying something back or again'") (quoting Black's Law Dictionary 1330 (8th ed. 2004)).

[4] CMI also repeatedly emphasizes that the obligation to repurchase is an "independent contractual obligation" and is not a remedy. The Court has no quarrel with CMI's position that repurchase is

6

While CMI's position is far from clear, it appears that CMI is asking this Court to interpret the term "***repurchase such defective Loan** from CMI at the price required by CMI ('Repurchase Price')*" to mean "***pay CMI the Repurchase Price***." However, replacing the words "***repurchase such defective Loan***" with the words "***pay CMI the Repurchase Price***" to accommodate CMI's interpretation would require this Court to rewrite the terms of the parties' contract in contravention of Missouri law. *See Renco Gp., Inc.*, 362 S.W.3d at 479 (in interpreting a contract, the court "must be guided by the well-established rules that [the court] cannot make contracts for the parties or insert provisions by judicial interpretation."); *Lowery v. Air Support Int'l, Inc.*, 982 S.W.2d 326, 329 (Mo. Ct. App. 1998) (the court's task is "to determine what the parties intended by what they said and not by what they might have said or what perhaps what they should have said") (quotation marks omitted); *Bydalek v. Brines*, 947 S.W.2d 135, 142 (Mo. Ct. App. 1997) ("A court cannot go outside an unambiguous agreement and make a new contract for the parties.").

The Court has also considered, and rejected, CMI's argument that the "carefully calibrated 'repurchase' process defined by the contract," under which the amount Equity owes is determined by the Repurchase Price formula, supports the interpretation urged by CMI. Doc. 226, p. 8-9. By CMI's own admission, in the case of a Loan that has been foreclosed on and the collateral sold, the Repurchase Price formula would need to be adjusted to account for proceeds from liquidation of the collateral. This admission by CMI gives heft to Equity's suggestion that the parties did *not* contemplate that the Repurchase Price would be applied in cases where a loan had been foreclosed on, and that the reference to "foreclosure expenses" in the Repurchase Price definition indicates, at most, an intent by the parties to include in the Repurchase Price expenses related to

---

an independent contractual obligation under Section 11. However, the relevant question is not whether it is a contractual obligation, but what it is a contractual obligation to do.

7

delinquencies up to and including threatened foreclosure proceedings. Equity's interpretation gives effect to and harmonizes the terms of the Agreement; CMI's does not.

For the above reasons, the Court does not find that its interpretation of the term "repurchase" was erroneous, and thus this alleged error does not provide a basis for changing the Court's prior ruling.

### C. The Risk-Shifting Purpose of the Agreement

CMI also argues that this Court's interpretation of the Agreement undermines a key purpose of the Agreement, which is to shift the risk of defective loans to Equity. CMI argues that this Court's ruling "creates dangerous precedent for the secondary mortgage market" because it "essentially hold[s] that an investor's contractual right to demand repurchase . . . can be negated by a correspondent seller who sells a defective loan and can then capitalizes [sic] on the situation where an investor buyer is forced to take reasonable and necessary steps to mitigate its losses through foreclosure and collateral sale when the loan goes into default." Doc. 226, at 2.

CMI's argument is without merit. As pointed out in the original order, Section 11 contemplates two separate means by which the risk-shifting purpose can be effected. Section 11 provides that if CMI identifies a loan defect and Equity does not cure it, "[Equity] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate." This Court's holding is that where there is no longer a "Loan" to be repurchased, the repurchase provision in prong (i) is inapplicable. However, in such a situation, the risk-shifting purpose of the Agreement is still effectuated, because CMI is still free to demand "other remedies"

8

under prong (ii), including but not limited to indemnification and/or a refund of a portion of the Loan purchase price.

CMI also suggests that this Court's ruling would give correspondents such as Equity an incentive to simply ignore their contractual obligation to repurchase defective Loans, wait for the Loans to go through foreclosure, and then claim that they are no longer obligated to repurchase the Loans. That argument reflects a misunderstanding of the Court's holding. The Court's holding is that Equity did not breach the Agreement by not repurchasing on demand a "Loan" that had already been foreclosed on *at the time of the repurchase demand.* If, instead, CMI had demanded repurchase of a Loan that had *not* been foreclosed on at the time of the repurchase demand, and Equity had failed to comply with that demand, then Equity's failure would have constituted a breach of contract for which Equity would be liable—regardless of whether CMI subsequently foreclosed on the Loan. Thus, this Court's ruling does not give correspondents any incentive to ignore their repurchase obligations and wait for foreclosure.

CMI also suggests that this Court's ruling produces a "no-win situation" for investors such as CMI, Fannie Mae, and Freddie Mac, because an investor must either take no action on a defective loan that goes into default (and risk facing an argument that it failed to mitigate its damages) or proceed with foreclosure and sale of the collateral in the normal course of business (and risk negating its contractual right to repurchase). Again, this argument is without merit. In many situations, the investor could simply make the repurchase demand before initiating foreclosure. In situations where that is not possible or feasible, the investor is not left without any remedy, but rather is free to seek remedies under the "other remedies" provision of Section 11.

Finally, the Court also notes that although CMI suggests that this Court's order "strikes at a fundamental precept of the secondary mortgage market," this Court's holding does not apply to

9

the entire secondary mortgage market, but rather to the specific Agreement in this case. Other parties operating in the secondary mortgage market are, of course, at liberty to define "repurchase" and "Loan" however they wish to in their contracts, and to include in their contracts any other provisions describing the specific obligations and remedies they find appropriate. This Court, however, must interpret the terms of the Agreement before it.

For the above reasons, the Court does not find that the risk-shifting purpose of the Agreement is undermined by its holding and finds that this argument provides no basis for changing the Court's prior ruling.

### D. The Decision in *CitiMortgage v. Royal Pacific Funding*

The Court has also considered CMI's argument that Judge Cohen's decision in *CitiMortgage, Inc. v. Royal Pacific Funding Corp.*, No. 4:16-CV-210-PLC, 2017 WL 3116135, at *8-*9 (E.D. Mo. July 21, 2017), compels a different result in this case. In *Royal Pacific,* the court found that, under an agreement substantively identical to the one at issue in the instant case, the defendant was obligated to repurchase Loans that had already been foreclosed on when CMI sent its repurchase demands. The arguments that the Court in *Royal Pacific* found persuasive were presented in this case and addressed in some detail in this Court's Partial Order. After review of the *Royal Pacific* decision, the Court finds no basis for revisiting its analysis or changing its conclusions.

Moreover, it appears that the court in *Royal Pacific* was not presented with all of the arguments and cases that this Court found persuasive in this case. First, it does not appear that the defendant in *Royal Pacific* cited the cases this Court relied on in which other courts have held that "repurchase" of a mortgage loan is impossible, as a matter of law, when the loan was foreclosed on and the underlying collateral was sold prior to a demand for repurchase. *See Nationwide*

10

*Advantage Mortg. Co. v. Mortg. Servs., III, LLC*, No. 13 C 83, 2013 WL 1787551, at *2-*3 (N.D. Ill. Apr. 25, 2013); *MASTR Asset Backed Secs. Trust*, 2012 WL 4511065, at *6; *First Place Bank v. Skyline Funding, Inc.*, No. 10 CV 2044, 2011 WL 3273071, at *4 (N.D. Ill. July 27, 2011). Second, it does not appear that the defendant in *Royal Pacific* raised the argument that the "Repurchase Price" formula in the Agreement does not account for the proceeds of a sale following foreclosure, which this Court found supported Equity's position that the parties did not contemplate repurchase after foreclosure and sale. It is unclear whether those arguments, had they been raised, would have affected the court's analysis in *Royal Pacific*.

For the above reasons, the Court does not find that *Royal Pacific* provides a basis for changing its prior ruling.[5]

### E. The Timing of the Sale of the Collateral Underlying the Dewey Loans

CMI argues that the Court made a factual error with regard to its description of two of the six loans at issue, the Dewey Loans. In making its prior ruling, the Court assumed (based on the briefing provided by the parties) that both foreclosure and sale of the underlying collateral had occurred for each of the six loans at issue prior to CMI's repurchase demand. CMI now points to evidence suggesting that with respect to the Dewey Loans, the sale of the collateral did not occur until after the repurchase demands. Equity argues that the evidence relied on is inadmissible and also argues that with respect to one loan, even if the sale of the collateral occurred after the repurchase demand, it occurred before Equity had breached any obligation to repurchase.

---

[5] The decision in *Royal Pacific* is not binding on this Court. *See Camreta v. Greene*, 563 U.S. 692, 708 n. 7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting 18 J. Moore et al., *Moore's Federal Practice* § 134.02[1][d], pp. 134-26 (3d ed. 2011))

11

The Court need not resolve these factual issues. As the discussion in part (A) above makes clear, it is the foreclosure that caused the Loans to cease to exist, not the sale of the underlying collateral. Thus, even assuming, *arguendo*, that the Court erred in its description of the timing of the sale of the collateral of the Dewey loans, the Court's conclusion would remain the same.

## IV.  CONCLUSION

For the reasons stated above, the Court finds no error in its prior ruling. Accordingly,

**IT IS HEREBY ORDERED** that CitiMortgage, Inc.'s Motion for Reconsideration is **DENIED**. The parties are reminded that this case is set for a bench trial on January 8, 2018, at 9:00 a.m.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of November, 2017.